UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JEFFREY SHANKS,

     Plaintiff,

v.                          CASE NO: 4:26-cv-36

MARGO SCHWARDRON and PUBLIC
EMPLOYEES FOR ENVIRONMENTAL
RESPONSIBILITY,

     Defendants.

_____/

**DEFENDANT PUBLIC EMPLOYEES FOR ENVIRONMENTAL
RESPONSIBILITY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT
AND MEMORADUM OF LAW IN SUPPORT THEREOF**

Defendant Public Employees for Environmental Responsibility ("PEER"), by
and through undersigned counsel, submits this motion to dismiss and incorporated
memorandum of law pursuant to 12(b)(6) of the Federal Rules of Civil Procedure.

This Court should dismiss all claims against PEER because Plaintiff's claims
for defamation are based on statements that are protected opinion under the U.S.
Constitution and Florida law that are not defamatory.  Plaintiff's Complaint does not
state a cause of action for "defamation per se" or "defamation per implication"
against PEER based on PEER's press release dated April 15, 2024.  Plaintiff's lawsuit

is intended to silence PEER and is the type of lawsuit Florida's anti-SLAPP statute, § 768.295, Fla. Stat. seeks to address. Florida's anti-SLAPP statute does not allow for a cause of action against another person or entity who has exercised the constitutional right of free speech in connection with a public issue. *Id.*

PEER's opinion of the results of the OIG's investigation is a non-actionable protected opinion based on fact. PEER's opinion cannot be interpreted by a reasonable reader as implying false, defamatory facts about Plaintiff. Plaintiff asserts PEER's press release "attributes criminal actions to Plaintiff." Doc. 1 at ¶ 33. This assertion is unfounded and does not state a cause of action of defamation per se or defamation by implication under Florida law. Nor can the press release be interpreted by a reasonable reader as implying false, defamatory facts about Plaintiff.

In addition, Plaintiff's Complaint should be dismissed based on Plaintiff's failure to comply with the pre-suit notice requirement of section 770.01, Florda Statutes (2025). PEER is a media defendant and is entitled to pre-suit notice as a condition precedent under section 770.01 prior to Plaintiff bringing action for libel or slander for PEER's publication of their press release. *Id.*

## FACTUAL INTRODUCTION

Plaintiff, Jeffrey Shanks, was a National Park Service archaeologist (NPS) who worked at the Agency's Southeast Archaeologist Center (SEAC). Plaintiff and his supervisor, Mike Russo, were the subjects of an investigation conducted by the

Department of the Interior Office of Inspector General (OIG) pursuant to a 2021 referral from the U.S. Office of Special Counsel (OSC), which had received a whistle-blower disclosure alleging three instances of misconduct on the part of Plaintiff and Mr. Russo. On September 6, 2023, The United States Department of the Interior issued a report based on their investigative findings of alleged misconduct by Plaintiff and Mr. Russo. September 6, 2023, correspondence from U.S. Dept. of the Interior, hereinafter, **Exhibit A**.

Defendant Margo Schwadron is a Regional Archeologist for the U.S. Fish & Wildlife Service (FWS) for the Pacific and South Pacific Regions. Prior to July 2023, Defendant Schwadron worked as an archaeologist for NPS at SEAC in Tallahassee, Florida. Defendant Schwadron had filed a whistleblower disclosure through the Office of Special Counsel (OSC) to address a series of issues relating to failure to attempt repatriation of Native American human remains and funerary objects by her colleagues, Plaintiff and his supervisor Mike Russo, in SEAC as required by the Native American Graves Protection and Repatriation Act (NAGPRA). The Secretary, in turn, tasked its Office of Inspector General (OIG) to investigate the matter and report back to the secretary. As a result, the OIG investigated claims based on Defendant' Schwadron's whistleblower disclosures, including allegations of misconduct by Plaintiff and Mike Russo, that included alleged violations of NAGPRA.

The OIG investigation concluded that two NPS archeologists, the Plaintiff and Mr. Russo, Plaintiff and Mr. Russo committed multiple violations of applicable federal law, regulations, and NPS policies, by setting up a private archaeology business while working at SEAC. *Id*. Specifically, the IG Report found that Plaintiff's violations of applicable federal laws, regulations, and NPS policies, included failure to seek ethics advice prior serving as a liaison with an outside organization in violation of NPS Director's Order 21 and 5 C.F.R. § 2635.808, and unauthorized use of official government logos on a 2017 book published by Plaintiff and Mr. Russo without permission for use of such logos, in violation of 44 U.S.C. 501. *Id*. Both Plaintiff and Mr. Russo left the NPS during the investigation.

The OIG discussed alleged violations of NAGPRA by Plaintiff and Mr. Russo associated with moving, storing, and selling Native American artifacts from tribal burial grounds as part of Plaintiff and Mr. Russo's private archaeology business. The IG concluded that it could not substantiate violations of NAGPRA alleged against Plaintiff and Mr. Russo. The OIG referred the alleged NAGPRA violations by Plaintiff and Mr. Russo to the U.S. Attorney, who ultimately declined to pursue criminal prosecution.

Defendant PEER is a service organization dedicated to protecting public employees who protect the environment. PEER serves as a "watch dog" for the public interest that informs the public about substantive environmental, natural

resource and public health issues of concern to PEER members. One of PEER's core goals is to defend and strengthen the legal rights of public employees who speak out about issues concerning natural resource management and environmental protection. PEER was founded in 1992 and since its inception has published press releases and commentary concerning certain areas of public interest. PEER publishes on average press releases from one (1) to two (2) times weekly. In addition to weekly publications, PEER widely disseminates information about PEER's ongoing work in a quarterly newsletter called Peer Review, in biweekly emails called PEER Mail. Further, PEER also conducts press interviews, webinars, and other public events. In its thirty-three (33) year history, PEER has broadcasted hundreds of media releases. In calendar year 2024, PEER issued 71 press releases, including the press release subject of Plaintiff's Complaint.

Defendant Schwadron contacted PEER following the OIG's investigation into Plaintiff and Mike Russo's activities as it pertained to their employment with NPS. On April 15, 2024, PEER published a press release providing its opinion of the OIG's investigative report and the results thereof, entitled *"Park Service Archeological Scandal Sparks No Reforms."* PEER April 15, 2024 Press Release- hereinafter **Exhibit B**. The Complaint alleges PEER's press release was a materially false and misleading summary of the OIG report that mischaracterized the OIG's findings. Doc

1. at ¶¶ 33-39. The Complaint alleges no further conduct by PEER other than the press release.

## <u>LAW AND ARGUMENT</u>

## I.   This Complaint Should be Dismissed under Rule 12(b)(6) for failure to State a Claim Upon Which Relief Can be Granted

In a Rule 12(b)(6) motion, a court takes all well-pleaded facts as true viewing them in the light most favorable to the plaintiff and asks whether the pleadings contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and a court is not bound to accept legal conclusions as true. *Id.* at 678.

Florida courts have performed a "prominent function" at the pleading stage in defamation cases by making an initial determination whether a challenged statement is actionable as a matter of law. *Byrd v. Hustler Magazine, Inc.,* 433 So. 2d 593, 595 (Fla. 4th DCA 1986) (citing *Wolfson v. Kirk*, 273 So. 2d 774, 778 (Fla. 4th DCA 1973)); *see also Smith v. Cuban Amer. Nat'l Found*., 731 So. 2d 702. 704 (Fla. 3d DCA 1999) (if a statement is not capable of defamatory meaning, the court should dismiss it as a matter of law). Florida courts recognize that special scrutiny must be

given to defamation claims at the motion to dismiss stage to safeguard public debate and freedom of speech. *See, e.g., Stewart v. Sun Sentinel Co.,* 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("pretrial depositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech") (quoting *Karp v. Miami Herald Publ'g Co.* 359 So. 2d 580, 581 (Fla. 3d DCA 1978)).

## A.  Plaintiff Fails to State a Viable Defamation Claim

Plaintiff's defamation claims are constitutionally protected opinion based on speech that is not defamatory.  Plaintiff alleges defamation "per se" and "defamation by implication."  Both allegations are based on the same allegedly defamatory speech, specifically PEER's summary and opinion of the OIG's report. Doc 1. at ¶¶ 33-39.

To state a cause of action for defamation per se in Florida, a plaintiff must allege (1) publication; (2) falsity; (3) that the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official or figure, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) that the statement was defamatory. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (*citing Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

Defamation by implication arises where "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts." *Jacoby v. CNN, Inc.*, 2021 U.S.App.LEXIS 36594 *6

(11th Cir. 2021) (quoting *Jews for Jesus*, 997 So. 2d at 1108) (internal quotations omitted). In such instances, "[the defendants] may be held responsible for the defamatory implication unless it qualifies as an opinion, even though the particular facts are correct." *Id.* (quoting *Jews for Jesus*, 997 So. 2d at 1108) (internal quotations omitted).

Whether a statement is defamatory is a question of law. *Id.* It is well settled under Florida law that "[t]rue statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected against defamation actions by the First Amendment." *Turner*, 879 F.3d at 1262 (11th Cir. 2018) (citing *Keller v. Miami Herald Pub. Co.,* 778 F.2d 711, 714 (11th Cir. 1985) (applying Florida law); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002); *Hallmark Builders, Inc. v. Gaylord Broad. Corp.*, 733 F.2d 1461, 1464 (11th Cir. 1984); *Stembridge v. Mintz*, 652 So. 2d 444 (Fla. 3d DCA 1995) (citation omitted). A statement is considered a "pure opinion" when "the defendant makes a comment or opinion based on facts which are set forth in the publication, or which are otherwise known or available to the reader or listener as a member of the public." *Id.*; *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006). In considering whether a statement is one of fact or opinion "the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words

used in the publication." *Keller*, 778 F.2d at 717; *Morse v. Ripken*, 707 So. 2d 921, 922 (Fla. 4th DCA 1998).  The court "must consider the context in which the statement was published." *Rasmussen v. Collier Cty. Publ'g Co.*, 946 So. 2d 567, 571 (Fla. 2d DCA 2006).

In the present case, there is no question that the allegedly defamatory statements are pure opinion and therefore cannot be legally construed as defamatory. Further, one of the allegedly defamatory statements was simply not directed toward, or descriptive of, Plaintiff.   It is undisputed, Plaintiff and Russo were in fact investigated by the OIG.  Doc 1 at ¶¶ 25, 26, 28, 31, 32, 33, 36, 38, 39, and 44. Plaintiff asserts PEER's press release incorrectly summarized OIG's report and was materially false and misleading.  Doc 1. at ¶¶ 33-39.  Plaintiff states certain language in the press release invites readers to conclude Plaintiff engaged in criminal actions. Plaintiff indicates the article's description of Native American artifacts being "trafficked," "stolen," and "desecrated" were defamatory because the OIG found no violations of cultural resource law.  Doc 1. at ¶ 33.  Plaintiff further alleges that Russo was the sole person that arranged to acquire human remains through a third party, and that Plaintiff's minimal actions should not be equated to Russo's. Doc 1. at ¶ 34, 37.

At the outset, the allegedly defamatory statement(s) described in Paragraph 33(b) of the Complaint cannot be construed as defamatory of Plaintiff, regardless of their truth or falsity. Accepting as true Plaintiff's allegation that "[t]he PEER press

release states that the subject remains were **"stolen" by a "known looter"** (emphasis in original) even though the OIG report found "no evidence disproving the Archeological Collector's widow's statement that the Archeological Collector had a valid permit to excavate and remove the archeological resources from the base[,]" Plaintiff fails to allege this statement defames Plaintiff himself. *See* Doc 1. at ¶ 33(b). As Plaintiff freely points out in his attempt to correct the allegedly false record, these phrases were used by PEER to describe the Archeological Collector identified in the OIG report. Plaintiff astutely alleges in Paragraph 32 that "Plaintiff is identified [in the OIG report] as 'Archeologist 2.'" Thus, the PEER press release does not state, and Plaintiff does not allege that it states, that Plaintiff stole anything or is known as a looter.

The remaining subsections of Paragraph 33 of the Complaint all sufficiently allege that the quoted statements applied to Plaintiff. Significantly, the very title of PEER's press release, "Park Service Archaeological Scandal Sparks No Reform" describes Plaintiff and Russo's actions as scandalous, not criminal. Further the press release's subtitle, "Trade in Native American Skulls and Funerary Pots Did Not Trigger Charges" specifically indicates no charges were brought because of the scandal[1].

---

[1] However, the OIG did find that the Plaintiff and his colleague committed ethical violations which carried criminal penalties and the OIG referred those matters to the U.S. Attorney for prosecution. In his Complaint (the Plaintiff characterizes these as "administrative violations" (footnote 1).

"[S]tatement[s] of opinion relating to matters of public concern which [do] not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Loraine Journal Co.*, 497 U.S. 1, 20 (1990). Statements consisting of "loose, figurative, or hyperbolic language" are not actionable, *See Id.* at 21, because "[a]lthough rhetorically hyperbolic statements may at-first blush appear to be factual they cannot be reasonably interpreted as stating actual facts about their target." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378-1379 (S.D. Fla. 2006). "[C]ommentary or opinion based on facts that are set forth in the article or which are otherwise known or available to the reader or listener are not the stuff of libel." *Rasmussen v. Collier County Publ'g Co.*, 946 So. 2d 567, 571(Fla. 2d DCA 2006); *accord Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984) ("Pure opinion is protected under the First Amendment…").

PEER's use of various modifiers to describe Plaintiff's and Russo's actions were expressions of opinion and rhetorical hyperbole, not factual statements. The press release in question was much more concerned with the NPS failure to improve NAGPRA implementation and enforcement. The release presented the OIG report's factual findings about Plaintiff merely as a vehicle to criticize the government's response, or lack thereof.

For instance, Plaintiff takes issue in Paragraph 33(a) of the Complaint with PEER's reference to "traffick[ing] in stolen Native American human [remains,][2]" in the first paragraph of the press release. Plaintiff contends that the OIG found his conduct did not constitute a criminal violation under 18 U.S.C. § 1170, which is titled Illegal Trafficking in Native American Human Remains and Cultural Items. However, Plaintiff's qualification was not necessary for anyone who had read PEER's press release, which itself clarified that "[Russo's and Plaintiff's] trafficking in stolen Native American human remains *did not constitute violations of law*." It is patently clear that PEER's use of the word "trafficking" expressed the opinion that Plaintiff's actions should have resulted in criminal prosecution, not that Plaintiff was a convicted trafficker. PEER opined in the following sentence of the press release that the "result creates a bad precedent[.]"

Plaintiff takes issue in Paragraph 33(c) of the Complaint with the press release's notion that Plaintiff "befriended" the previously referenced "known looter . . . who offered to sell his collection of funerary pots and two Native American Skulls." Here again, Plaintiff provides additional context within his Complaint, clarifying that the OIG report stated it was Russo alone who organized the straw conveyance and Plaintiff merely accompanied Russo to retrieve the items on a single

---

[2] The quoted text in Plaintiff's Complaint reads "traffick[ed] in stolen Native American human," while the PEER press release itself reads, "trafficking in stolen Native American human remains…."

occasion. Plaintiff appears to suggest that his limited interaction with the "known looter" renders false PEER's suggestion of friendship.  Again, the statements made in PEER's press release are pure opinion.  As such, these statements are not subject to a legal claim of defamation.

The very concept of friendship is subjective. Friendship is a relationship that depends entirely on belief and can never be affirmatively proven. Biological, marital, or contractual relationships, by contrast, can all be affirmatively proven. Marital and contractual relationships can also be affirmatively terminated. Friendship can be disproven in certain instances, such as where two alleged friends have never met or interacted with one another in any way, but once two people meet, their status as friends becomes a matter on which reasonable minds may disagree.

Plaintiff fails to mention in Paragraph 33(c) of the Complaint that the OIG report indicated Plaintiff and Russo went to the "known looter's" personal residence to retrieve the items, and that the Native American skulls had not been negotiated as part of the original deal. Thus, against the factual backdrop of a home visit and the apparent gifting of human skulls, PEER characterized Plaintiff and Russo as having befriended the "known looter." Because the possibility of friendship between Plaintiff and the "known looter" is not readily capable of being proven false, it is protected from Plaintiff's defamation claims by the First Amendment. *See Turner*, 879 F.3d at 1262 (11th Cir. 2018) (citing *Keller v. Miami Herald Pub. Co.,* 778 F.2d 711, 714

(11th Cir. 1985) (applying Florida law). It is thus clear that Plaintiff had some personal relationship with this person and that their interactions could be fairly characterized as more than casual.

Notably, Plaintiff does not dispute that he was in possession of Native American human remains as well as at least twenty sacred funerary objects. Nor does he allege that he made any effort to repatriate these objects as required by NAGPRA. In short, while Plaintiff may disagree with the characterizations in the PEER press release, the Complaint in no way establishes that he was portrayed in a false light.

Finally, Plaintiff takes issue in Paragraph 33(d) of the Complaint with the words "blatant desecrations." As with the "trafficking" quote addressed previously, PEER used the phrase "blatant desecrations" to convey its opinion on Plaintiff's conduct as laid out in the OIG report. PEER was not making an independent claim that Plaintiff committed any specific act(s) of desecration; rather, PEER was expressing the opinion that it considers Plaintiff's actions, as laid out in the OIG report, to have constituted desecration(s). It is also important to note that the central focus of the sentence in question is to criticize the OIG's course of action, not Plaintiff's own actions.

The passages of PEER's press release quoted in Paragraphs 33(a), 33(c), and 33(d) of Plaintiff's Complaint all constitute "commentary or opinion based on facts that are set forth in the article or which are otherwise known or available to the

reader." *See Rasmussen* 946 So. 2d at 571 (Fla. 2d DCA 2006). PEER's press release was accompanied by a link to the OIG report, allowing the reader to read the full report themselves. Thus, readers had the immediate ability to verify that the OIG's investigation of Plaintiff and Russo's actions did not result in any criminal charges relating to the artifacts they obtained from the archeological collector. Readers who elected to review the OIG report would also learn that Plaintiff and Russo were not exonerated of wrongdoing; their conduct simply did not strictly satisfy to the essential elements of violations of the Archaeological Resources Protection Act (ARPA), the Native American Graves Protection and Repatriation Act, and 18 U.S.C. § 1170, respectively. Ex. A at 2-3.  PEER's press release is clearly an opinion piece regarding PEER's frustration regarding OIG's investigation and failure of the whistleblower disclosure process to yield a more meaningful result.

Thus, Plaintiff's Complaint fails to allege facts sufficient to plead defamation because certain statements in question were not directed toward, and did not concern, Plaintiff, and the remaining statements were either true, not readily capable of being proven false, or statements of pure opinion. Accordingly, this Court should dismiss Plaintiff's claims against PEER.

## II.    PEER's Press Release is Protected by Qualified Privilege

To the extent PEER's press release reports facts rather than provides opinions, it is protected by Florida's fair report privilege. Under Florida law, a news agency has

a qualified privilege to report accurately on information received from government officials or organizations. *Rasmussen*, 946 So. 2d at 570 (Fla. 2d DCA 2006). "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Id.* at 571.

In *Rasmussen*, Florida's Second District Court of Appeals upheld the trial court's grant of summary judgment to the defendant, Daily News, based in part on the fair report privilege. *Id.* The Daily News had reported for several years about a golf resort which the plaintiff, William Rasmussen, had planned to develop. *Id.* at 569. Rasmussen, who had established ESPN, was eventually charged in connection with the planned golf resort with fraud in one case, and with racketeering and conspiracy to commit money laundering in a separate case. *Id.* Rasmussen ultimately pleaded guilty to reduced misdemeanor fraud charges in one case and agreed to testify on behalf of the State in exchange for dismissal of the case for racketeering and conspiracy. *Id.* Rasmussen's lawsuit against *Daily News* alleged that the publication's reporting suggested he had pleaded guilty to the charges in the racketeering and conspiracy case. *Id.*

The trial court in *Rasmussen* concluded, and the appellate court agreed, that the Daily News was shielded by the fair report privilege because it "fairly and accurately described matters of public record, including the criminal information, . . . Mr. Rasmussen's plea agreement, and reports by government officials that Mr.

Rasmussen pleaded to 'related charges.'" *Id.* at 571. The court also held that, "[i]n conveying news and comment to its readers, the Daily News need not describe legal proceedings in technically precise language." *Id.* at 570.

In the present case, PEER published a press release outlining the findings of an investigation. PEER's account was reasonably accurate and fair. It accurately stated that the OIG investigation found Plaintiff had been involved in the private transfer of potsherds and Native American skulls, and that the transfer was in fact a monetary transaction facilitated through a third party. It likewise accurately reported that the investigation "did not trigger charges," and Plaintiff's conduct "did not constitute violations of law."   Furthermore, PEER's on-line press release, among other things, summarized the OSC referral letter and OIG's findings.  The website contained links to display the following:

> ➢ The OSC referral letter to the Interior Secretary;
>
> ➢ The Department of the Interior response, including the OIG findings, to OSC;
>
> ➢ The whistleblower's comment letter; and
>
> ➢ The OSC letter to President Biden and to the appropriate Congressional Committees.

The links provided immediate access to official documents described in the release; the finding of an administrative review under the U.S. Whistleblower Protection Act a subsequent criminal investigation by the OIG, and the ensuing Executive Branch

actions. Accordingly, PEER's reporting is protected by Florida's fair report privilege and this Court should dismiss Plaintiff's claims against PEER on those grounds.

### III. Plaintiff's Action Against PEER Is Prohibited As a Strategic Lawsuit Against Public Participation (SLAPP) by Florida's Anti-SLAPP Statute

"Florida's anti-SLAPP statute prohibits a person from filing a cause of action against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue[.]" *Parekh v. CBS Corp.*, 820 Fed. Appx. 827, 836 (11th Cir. 2020) (*quoting* Fla. Stat. § 768.295(3)) (internal quotations omitted). "It provides that [t]he court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section." *Id.* (*quoting* Fla. Stat. § 768.295(4)) (internal quotations omitted)).

"[T]he Anti-SLAPP statute requires the trial court to do more than accept as true the factual allegations in the four corners of the complaint and draw all reasonable inferences therefrom in favor of the claimant." *Mishiyev v. Davis*, 402 So. 3d 443, 448 (Fla. 2d DCA 2025). Rather, the trial court must apply a burden-shifting test wherein the defendant must first "set forth a prima facie case that the Anti-SLAPP statute applies[,]" and the Plaintiff must then "demonstrate that [their causes of action] are not primarily based on First Amendment rights in connection with a public

issue and not 'without merit.'" *Id.* (*quoting Davis v. Mishiyev*, 339 So. 3d 449, 453 (Fla. 2d DCA 2022)).

"Undisputedly, Florida's Anti-SLAPP statute protects the right to exercise 'free speech in connection with public issues . . . as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution.'" *Id.* (*quoting* Fla. Stat. § 768.295(1)). "[F]ree speech in connection with public issues is any written or oral statement that is protected under applicable law and . . . made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, *magazine article*, musical work, *news report*, or *other similar work*." *Id.* (*quoting* Fla. Stat. § 768.295(2)(a)) (emphasis original) (internal quotations omitted). Thus, a defendant may set forth a prima facie case that the Anti-SLAPP statute applies by showing that their statements (1) were protected by the First Amendment and (2) were made in connection with one of the listed media formats or other similar modes for widely disseminating protected First Amendment speech. *See id.* at 448-449 (*citing WPB Residents for Integrity in Gov't, Inc. v. Materio*, 284 So. 3d 555, 562 (Fla. 4th DCA 2019) (Gross, J., concurring specially)) (additional internal citations omitted).

As to the first prong of this Court's analysis, PEER reiterates its previous argument that all statements directed toward Plaintiff within the press release at issue were either "[t]rue statements, statements that are not readily capable of being proven

false, and statements of pure opinion[,]" which are thereby "protected against defamation actions by the First Amendment." *Turner*, 879 F.3d at 1262 (11th Cir. 2018) (citing *Keller v. Miami Herald Pub. Co.,* 778 F.2d 711, 714 (11th Cir. 1985) (applying Florida law); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002); *Hallmark Builders, Inc. v. Gaylord Broad. Corp.*, 733 F.2d 1461, 1464 (11th Cir. 1984); *Stembridge v. Mintz*, 652 So. 2d 444 (Fla. 3d DCA 1995) (citation omitted).

As to the second prong, PEER submits that its medium of publication, a dedicated press release on its public website, could reasonably be considered a magazine article, news report, or at least a work similar thereto. *See Mishiyev*, 402 So. 3d at 448 (Fla. 2d DCA 2025); Fla. Stat § 768.295(2)(a). Indeed, Federal District Courts in Florida and Florida's own District Courts of Appeal have found even less formal digital mediums to be sufficiently similar to those listed in the Anti-SLAPP statute. *see Sterling v. De La Rosa*, 2025 U.S. Dist. LEXIS 255739 *26-27 (Fla. M.D. December 9, 2025) (finding that "[s]tatements made on social media, such as Twitter, appear to fall within the ambit of the Anti-SLAPP law"); *see also Mishiyev,* 402 So. 3d at 448-49 (statements made "on social media" were covered, while statements made *outside* social media or another enumerated medium, such as statements made only to another individual, were not) (citation omitted); *McQueen v. Baskin*, 377 So. 3d 170, 176 (applying Anti-SLAPP analysis to statements made online).

IV.    **Plaintiff Failed to Provide the Statutorily Required Pre-Suit Notice for Defamation Actions Under Fla. Stat. § 770.01**

Florida law has a statutory pre-suit notice requirement in defamation actions. Florida Statute § 770.01, requires a defamation plaintiff to provide at least five (5) days written notice prior to instituting a defamation claim:

> "Notice condition precedent to action or prosecution for libel or slander.- Before any civil action can be brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory."

Florida Statute § 770.01 (2025)

PEER frequently broadcasts media releases and has generated extensive media coverage, averaging approximately 1.5 media articles per day in outlets ranging from the *New York Times* and the *Wall Street Journal* to local papers and in scores of specialty publications such as *Government Executive* magazine and *National Parks Traveler,* an online journal of news relating to national parks.[3] As such, PEER is a major news content creator for print, broadcast, and online media. Plaintiff's claims are premised on allegedly false statement contained in a press release by PEER on April 15, 2024. Therefore, pursuant to § 770.01, before commencing action against Defendant, Plaintiff was required to provide written notice to Defendant specifying which statement he alleges to be false and defamatory. Plaintiff failed to provide the

---

[3] See https://peer.org/the-newsroom/news-clips/

requisite pre-litigation notice and therefore dismissal is mandated by law.  Plaintiff's

Complaint does not indicate he complied with Fla. Stat. § 770.01.  To the contrary,

Plaintiff's Complaint indicates Plaintiff's counsel contacted PEER in May 2024, to

explain the inaccuracies of the press release.  Doc. 1 at ¶ 40.  PEER's records indicate

that this characterization is not accurate. The only prior communication PEER had

received from Mr. Shanks was from an attorney named Mark Zaid who contacted the

organization in May 2024 to determine whether PEER represented Ms. Schwadron.

PEER can find no record of any attempt to point out any alleged inaccuracies in April

15, 2024, release or a demand for correction. Even if the Complaint's representation

of contact with PEER is correct, Plaintiff's alleged contact with PEER to discuss

discrepancies with the press release over a year and a half prior to filing suit does not

equate to compliance with the Florida Statute § 770.01.

Failure to comply with Florida Statute § 770.01, pre suit notice makes

Plaintiff's defamation case insufficient and incomplete in commencing his cause of

action.  See *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607 (Fla.

4th DCA 1975).

## CONCLUSION

**WHEREFORE,** for the foregoing reasons, the Court should enter an order dismissing Plaintiff's claims against PEER with prejudice.   Defendant further reserves the right to move for attorney's fees and costs pursuant to Florida's anti-SLAPP statute; Fla. Stat. Ann. § 768.295.

## <u>LOCAL RULE 5.1(F) CERTIFICATION</u>

I HEREBY CERTIFY that a copy of the foregoing has been furnished via CM/ECF[4] to all interested parties, this 2nd day of March, 2026.


**JAMIE ITO**
FL Bar No. 13553
Jamie@itolaw.net
Ito Law, PLLC
411 Wilson Ave.
Tallahassee, FL 32303
(850) 296-3717
*Attorney for Plaintiff*


**John C. Spaccarotella**
Assistant United States Attorney
New York Reg. No: 4304291
21 E. Garden Street, Suite 300
Pensacola, FL 32502
Telephone: (850) 444-4046
Email: john.spaccarotella@usdoj.gov
*Attorney for Defendant Margo Schwadron*

---

[4] Counsel for PEER was unable to file this motion, memorandum of law, and the attached exhibits through CM/ECF on March 2, 2026, as CM/ECF was experiencing technical issues. Counsel has provided such materials to the Court and counsel for all interested parties via email in the interim, and will file through CM/ECF once it returns to normal operations.

Respectfully submitted,

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**

/s/ *Thomas M. Eisman*
**NITTAYA ROSSOMONDO**
**FLORIDA BAR NO. 0010351**
**THOMAS M. EISMAN**
**FLORIDA BAR NO. 1049577**
227 N. Bronough Street, Suite 7400
Tallahassee, Florida 32301
Telephone: 850-412-1042
Facsimile: 850-412-1043
E-mail: nittaya.rossomondo@qpwblaw.com
E-mail: thomas.eisman@qpwblaw.com
E-mail: gail.clark@qpwblaw.com
*Attorneys for Defendant, Public Employees for*
*Environmental Responsibility*

# Exhibit A



## United States Department of the Interior
### OFFICE OF THE SOLICITOR
Washington, D.C. 20240

September 6, 2023

Dondrae N. Maiden
Acting Associate Solicitor for General Law
Office of the Solicitor
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

Hon. Henry Kerner
Special Counsel
U.S. Office of Special Counsel
1730 M. Street, N.W., Suite 300
Washington, DC 20036

Dear Mr. Kerner:

The Department of the Interior ("Department") writes to provide a response to your October 22, 2021 referral (OSC File No. DI-21-000866) of a whistleblower disclosure for investigation by the Secretary of the Interior. I was referred this matter for response on behalf of the Secretary of the Interior and have been delegated the responsibility of submitting the Department's report to the Office of the Special Counsel.

Pursuant to 5 U.S.C. § 1213(d), I am providing the attached Office of Inspector General ("OIG") record of investigation (Attachment 1), a description of that investigation and the evidence collected, the Department's determination, and the Department's proposed corrective action. As described in greater detail below, the OIG concluded that the two archeologists in question did not violate the Archaeological Resources Protection Act ("ARPA"), the Native American Graves Protection and Repatriation Act ("NAGPRA"), or the National Historic Preservation Act ("NHPA"). However, the OIG did substantiate various findings concerning the two archeologists' interactions with a Partner Organization as well as improper use of federal resources. My office has reviewed the OIG report and supporting documentation and concurs with the OIG's findings.

### U.S. OFFICE OF SPECIAL COUNSEL REFERAL (OSC File No. DI-21-000866)

On October 22, 2021, Special Counsel Henry Kerner referred a whistleblower disclosure by ███ ████████ regarding potential violations of law, rule, or regulation; gross

mismanagement; and an abuse of authority by two archeologists at the National Park Service ("NPS") ███████████ ("NPS Facility").  Specifically, ███████████ made several allegations concerning ███████ ("Archeologist 1") and ███████ ("Archeologist 2").

The Special Counsel referred three allegations to be investigated:

1. Archeologist 1 and 2 violated the Archeological Resources Protection Act and the Native American Graves Protection and Repatriation act by facilitating the transfer of looted Native American funerary items and human remains from a third party to NPS;
2. The involvement of Archeologist 1 and 2 with the ███████████ ███████ ("Partner Organization") and their promotion of personal ventures using the Partner Organization's resources, violated federal regulations and agency policy on ethical conduct; and
3. Archeologist 1 and 2 failed to consult with Native American tribes prior to investigating and excavating burial mounds in violation of statutory, regulatory, and policy requirements.


## SUMMARY OF THE EDVIDENCE OBTAINED AND CONCLUSIOSN OF THE INVESTIGATIONS


### I.    Findings Regarding the Archaeological Resources Protection Act and the Native American Graves Protection and Repatriation Act

*Factual Background*

The OIG determined that in 2017, an archaeological collector approached Archeologist 1 and offered to sell the NPS some Native American potsherds that he retrieved from burial mounds on Tyndall Air Force Base near Panama City, Florida, in the 1960s.  The archaeological collector died in late 2018 and his widow stated that he had a permit from the Tyndall Airforce Base to excavate archaeological items in the 1960s but was no longer in possession of the permit.  The OIG contacted an official at the Tyndall Air Force Base, but the official was unable to locate any permit.  However, the official noted that the base had lost a significant number of paper records during Hurricane Michael in 2018.  Thus, the OIG was unable to verify whether the archaeological collector possessed a proper permit to excavate archaeological items on federal land.

Archeologist 1 told the collector that NPS could not purchase the items from him because the purchase would be in violation of 18 U.S.C. § 1170.  However, later, Archeologist 1 asked a friend of his ("Person 1") to purchase the potsherds from the archeological collector so that they could be donated to the State of Florida.  Person 1 gave a personal check to Archeologist 1 to purchase the potsherds in order to donate them to the State of Florida.

In 2017, Archeologist 1 and 2 retrieved from the residence of the archaeological collector the potsherds as well as what the archaeological collector identified as two Native American skulls. Archeologist 1 told OIG investigators that he subsequently gave the human remains and potsherds to a Collections Conservation Supervisor employed by the State of Florida. Subsequently, the Collections Conservation Supervisor confirmed that they received what were purported to be human remains of a Native American in April of 2018 and that the State of Florida was in the process of repatriating them. When asked, the Collections Conservation Supervisor denied receiving any potsherds from Archaeologist 1 and told the OIG that the State did not accept artifacts that were not collected on State Land. During the course of their investigation, the OIG located the potsherds stored on a bookshelf outside the office of Archaeologist 1 but was unable to further question Archaeologist 1 because he had invoked the right to counsel before the OIG could interview him a second time.

*Findings – ARPA*

Pursuant to DOI regulations and ARPA[1], "no person or agency may excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public or Indian lands" without a permit or exemption. To establish a criminal violation under ARPA, the Government must show that an archaeological resource that falls within the meaning of the statute was removed from public or Indian lands without a permit. Although the OIG was not able to locate the permit that the archaeological collector asserted that he had to excavate in the 1960s, there was no evidence disproving the assertion of either the archaeological collector or his widow that he had indeed possessed a proper permit. Additionally, the OIG noted that although base officials did not find any permit, the base acknowledged that it had lost records in 2018 due to a hurricane and therefore the permit records could have been destroyed prior to the OIG investigation. Thus, the OIG concluded that it could not establish that a violation of ARPA or associated DOI regulations occurred.

*Findings – NAGPRA*

NAGPRA prohibits the intentional excavation and removal of Native American human remains and objects without first complying with certain consultation and other requirements.[2] The regulations implementing NAGPRA further clarify that consultation requirements arise when notice is received that remains are or are likely to be Native American.[3] The OIG concluded that it could not establish a violation of NAGPRA because it could not establish that NAGPRA was applicable to the excavation or purchase of the potsherds as all evidence suggested that the archeological collector obtained the times before NAGPRA's enactment in 1990. As a result, the OIG concluded that Archaeologist 1 and 2's acquisition of the potsherds did not violate NAGPRA.

*Findings 18 U.S.C. § 1170*

---

[1] 43 C.F.R. § 7.4(a); 16 U.S.C. § 470ee(a)
[2] 25 U.S.C. § 3002(c)
[3] 43 C.F.R. § 10.5(a)

The OIG also evaluated if Archaeologist 1 and 2 violated 18 U.S.C. § 1170 when they came into possession of the human remains potentially of Native American origin. 18 U.S.C. § 1170 is only applicable if human remains of a Native American are transported for sale or profit. Because neither Archeologist 1 nor 2 transported the human remains for profit, the OIG determined that their actions did not violate 18 U.S.C. § 1170.

## II.    Findings Regarding the National Historic Preservation Act

As employees of the NPS, Archeologist 1 and 2 worked on several projects that involved the NHPA. The NHPA requires that Federal agencies determine whether a Federal undertaking could affect historic properties. If it is determined that the undertaking would affect historic properties, then the agency must consult with the appropriate State Historic Preservation Officer or Tribal Historic Preservation Officer.[4] When more than one Federal agency is involved in an undertaking, one agency is designated as the lead agency and becomes responsible for ensuring that the NHPA consultation process is followed.

The OIG reviewed six federal undertakings that Archeologists 1 and 2 were part of from 2015 to 2021. The OIG concluded that Archaeologists 1 and 2 did not violate the NHPA consultation requirements because, in all of the reviewed instances, the NPS was not the lead agency and thus there was no consultation requirement for the NPS to fulfill. Additionally, the OIG concluded that, when appropriate, the lead Federal agency either properly initiated consultations in accordance with the NHPA, or there was no need for a consultation to occur.

## III.    Findings Regarding Archeologist 1 and 2 Serving as Liaisons to a Partner Organization

Around 2015 or 2016, a former NPS Supervisory Archaeologist at the NPS Facility wanted to establish a philanthropic partner for the NPS Facility and directed Archeologist 1 to conduct research on the issue. In April 2016, Archeologist 1 incorporated the Partner Organization with the State of Florida and paid the filing fees with his personal funds. After its establishment, the NPS Supervisory Archeologist signed an agreement establishing an official relationship between the NPS Facility and the Partner Organization. Archeologist 1 was then appointed to be the liaison to the Partner Organization at his request. In turn, Archeologist 1 assigned Archeologist 2 to also be a liaison to the Partner Organization.

NPS Director's Order 21 outlines and establishes roles and responsibilities for NPS employees who work with philanthropic partners such as the Partner Organization. The Order states that NPS employees cannot be voting members or serve on the board of directors of such organizations, but it is silent as to whether an NPS employee may *incorporate* such an organization. Director's Order 21 further provides that NPS employees can serve as liaisons to authorized partners as part of their official duties but that they "should" consult with an NPS ethics officer to ensure compliance with all applicable ethics requirements. The OIG concluded

---

[4] 54 U.S.C. § 300101 et seq.; see also 36 C.F.R. § 800.1(a). 36 C.F.R. § 800.16(y). This regulation explains that a Federal undertaking is a project or activity funded, permitted, licensed, or approved by a Federal agency. Historic properties include artifacts, records, and remains that are related to and located within historic properties and any properties of traditional religious and cultural importance to Native American Tribes. See also 54 U.S.C. § 306108.

that neither Archaeologist 1 nor Archeologist 2 consulted with an NPS ethics official per Director's Order 21 before they began serving as liaisons. However, in September 2021, Archeologist 2 did consult with the NPS Ethics Office and confirmed this fact for the OIG in November 2021.

Thus, the OIG concluded that before serving as liaisons to the Partner Organization, neither Archeologist 1 nor 2 followed the recommendation in Director's Order 21 to consult with an NPS ethics official.

### IV.    Findings Regarding Archeologist 1 and 2 in Connection with Actions Taken with the Partner Organization

*Archeologist 2 Violated NPS Director's Order 21, Government Ethics Standards and 18 U.S.C. § 209 by Creating a GoFundMe Campaign and Accepting Payment for His Travel Expense*

In 2018, the Partner Organization raised $4,582 through a GoFundMe campaign and provided the funding to the NPS Facility for a project. Archeologist 2, in an official capacity, was the lead for the NPS Facility project the Partner Organization donated funding for. During the course of the investigation, Archeologist 2 admitted that he helped the Partner organization establish the fundraising campaign, provided a link to the fundraising site in social media posts where he also posted his position as the NPS team lead, and commented that donations were being accepted at the link he posted. Additionally, Archeologist 2 admitted that some of the money raised by the Partner organization paid for his travel expenses for the NPS Facility project.

The OIG determined that Archeologist 2's involvement in fundraising by the Partner Organization for the NPS Facility project violated both 5 C.F.R. § 2635.808 and NPS Director's Order 21. Because he publicly supported the Partner Organization's fundraising campaign and specifically identified himself as an NPS employee, the OIG determined that Archeologists 2 engaged in improper solicitation. Additionally, the OIG determined that accepting travel payments from the Partner Organization for official travel and conduct in relation to archaeology work without obtaining ethics approval was in violation of 18 U.S.C § 209.

*Archeologist 2 Improperly used his Partner Organization Debit Card for Official NPS Travel Expenses in Violation of 18 U.S.C. § 209.*

During the investigation the OIG discovered that the Partner Organization issued Archeologist 2 a debit card that allowed him to withdraw money from the Partner Organization's bank account. After initially denying that he possessed the debit card, Archeologist 2 admitted he was in possession of the card and used it to pay for airline travel, hotel, parking, and to attend a conference in his official capacity as an NPS employee. The total cost billed to the Partner Organization was $1,388.90.

The OIG determined that although Archeologist 2 stated that he believed NPS Director's Order 21 to allow the Partner Organization to pay for travel expenses, it does not apply to donations of official travel expenses covered by 31 U.S.C. § 1353. And although 31 U.S.C. § 1353 permits donations for attendance at a meeting or similar function, Archeologist 2 never secured the

necessary approvals and did not disclose to the NPS that an outside party paid for his travel expenses. Therefore, the OIG determined that this conduct violated 18 U.S.C § 209.

*Publication of a Book Regarding NPS Work Violated 44 U.S.C. § 501.*

During its investigation, the OIG identified a book published in 2017 authored by Archaeologist 1 and 2 that contained both NPS and FWS official logos. The book was published by the Partner Organization but contained official work by Archeologist 1 and 2. Archeologist 1 admitted that he did not have permission to use either the NPS or FWS logos. Archeologist 2 maintained that he did get proper permission from the appropriate NPS and FWS officials. The NPS official in question denied that he provided permission to use the NPS logo. The FWS official in question confirmed she authorized the use of the FWS logo on the book cover but thought that it would be published thought the U.S. Government Printing Office and not sold on online by the Partner Organization.

The OIG determined that the publication of the book in question violated 44 U.S.C. § 501, which requires that all Federal printing work is to be done by the Government Printing Office.

*Archeologist 2's work on Grant Applications for the Partner Organization Violated Government Ethics Regulations*

The OIG concluded that both Archeologist 1 and 2 acknowledged that they assisted the Partner organization with its grant proposals. In particular, in 2020, the Partner Organization applied for a State-funded grant to erect signs at various historical sites. Archeologist 2 admitted to working on the application, including the statement of work. Additionally, on a separate occasion in 2020, Archeologist 2 worked on and submitted grant applications on behalf of the Partner Organization. The investigation also revealed that Archeologist 2 sent a letter in his official capacity on NPS letterhead to the State Grants Program recommending it consider providing grant funding to the Partner Organization for a project in the state. In the letter, Archeologist 2 did not disclose the relationship between the NPS Facility and the Partner Organization, or that he was an official liaison to the Partner Organization. Finally, the OIG discovered that Archeologist 2 was listed as the point of contact in the System for Award Management[5] and on a grant application.

The OIG determined Archeologist 2 violated 5 C.F.R. 2635.101(b)(2) and (14) by engaging in conduct that created or appeared to create a conflict of interest; specifically, Archeologist 2 assisted the Partner Organization with multiple grant proposals, and was in possession of a debit card that provided Archeologist 2 with access to the organization's grant funds. The OIG determined that at a minimum, due to the Archeologist 2's dual role, it created the appearance of a potential personal financial interest in the Partner Organization's receipt of grants. Finally, the OIG determined that the correspondence sent on NPS letterhead in an official capacity requesting the State consider the Partner Organization for a grant was an improper use of the

---

[5] System for Award Management (SAM) is a Governmentwide portal that consolidates the capabilities of multiple systems and information sources used by the Federal Government in conducting the acquisition and financial assistance process, including grants.

Archeologist 2's position to endorse an enterprise and violated Archeologist 2's obligation to act impartially and avoid giving preferential treatment to a private organization.

V.    **Archaeologist 2 Violated Various Federal Regulations by Using Government Equipment and Government Position for Personal Business**

In 2014, Archeologist 2 established a personal business in the State with two other individuals who were not federal employees.  The OIG identified multiple files on Archeologist 2's Government-issued laptop related to the personal business, and more than 400 files related to Archeologists 2's business located on the NPS server.  Archeologist 2 admitted to using the Government-issued laptop to conduct his personal business, including using various computer programs, but maintained that he did not work on his personal business during official government time.  The OIG also identified that, in a publication associated with Archeologist 2's business, it prominently identified him as an NPS archaeologist.

The Departmental Manual specifically provides for only limited personal use of Government equipment, and it does not permit use of Government resources for personal business activities.[6] In addition, per 5 C.F.R. § 2635.702(b), Government employees may not "use or permit the use of their Government position or title, or any authority associated with their public office in a manner that could reasonably be construed to imply that their agency or the Government sanctions or endorses their personal activities."

The OIG determined that Archeologist 2's use of a Government-issued laptop as well as storing personal business documents on the laptop's hard drive and the NPS server violated restrictions both in the Department Manual and the applicable federal regulations that prohibited the use of government furnished equipment for personal business activities.  Additionally, The OIG determined that the reference to Archeologist 2's status as an NPS archaeologist on a personal business publication was inconsistent with federal regulations that prohibit federal employees from using their Government position or title in a way that could be construed as implying that the Government endorses their personal activities.

VI.    **Archeologist 2 Violated Federal Regulations Through his Improper Affiliation with Nonprofit Group**

In 2020, Archaeologist 2 incorporated a Nonprofit Group aimed at supporting local archaeological work with the state.  Archeologist 2 explained that he incorporated the Nonprofit Group after learning about funding the NPS Facility would receive from the Federal Emergency Management Agency.  Archeologist 2 opened a bank account for the Nonprofit Group and signed bank documents using his Government PIV card.  Archeologist 2 also created an invoice on behalf of the Nonprofit Group in the amount of $10,000 for webinars that he would conduct and sent it from his NPS email address for payment.  Subsequently, Archeologist 2 paid the Nonprofit Group the amount using a Government-issued purchase card.  Archeologist 2 was unable to transfer the $10,000 from the Nonprofit Group's payment account to its bank account so instead he used his personal account as an in-between account to facilitate the transfer.  The

---

[6] 410 *Departmental Manual* 2.

Nonprofit Group used the $10,000 to hire a separate company to provide various services. The company that Archeologist 2 recommended to the Nonprofit Group was a company where his relative worked.  Additionally, in 2020, Archeologist 2 hired a graphic design company to create a website and Facebook page for the Nonprofit group.  Archeologist 2 paid the owner of the company $2,5000 with a Government-issued purchase card.

The OIG determined that, in both of these instances, using a Government charge card to pay the expenses of the Nonprofit Group violated 5 C.F.R. § 2635.702.


## DEPARTMENT'S EVALAUTION OF THE OIG's INVESTIGATION AND ASSOCIATED CORRECTIVE ACTION

### I.    Archaeological Resources Protection Act and the Native American Graves Protection and Repatriation Act

My office has reviewed the OIG's investigation regarding the allegation that Archaeologist 1 and 2 violated ARPA and NAGRPA through their actions in 2017 and 2018 in connection with various potsherds and human remains.  As indicated in the summary of the OIG's findings, the OIG concluded that it could not establish whether the archeological artifacts in question were obtained with a proper permit and thus could not conclude with certainty that ARPA was violated.  Having reviewed the OIG's report, I agree that given the facts of this case, there is no evidence to refute the assertion that the archaeologist collector possessed the proper permits to excavate the materials in question in the 1960s.  Additionally, I agree with the OIG's conclusion that NAGPRA was not applicable to the excavation of the items in the 1960s, nor to the purchase of the items in 2017/2018 because all evidence suggests that the items were initially obtained prior to NAGPRA's 1990 enactment, and thus NAGPRA is not applicable.  Finally, I concur with the OIG's findings that neither Archeologist 1 nor 2 violated 18 U.S.C. § 1170 because the transportation of the Native American remains in question was not for sale or profit, which is a necessary element for a violation of that statute to occur.  I also note that the OIG's referred these matters to the U.S. Attorney's Office with appropriate jurisdiction and they declined to prosecute this matter.  Therefore, the Department will take no further action.

### II.    National Historic Preservation Act

My office has reviewed the OIG's investigation regarding the allegation that Archeologist 1 and 2 violated NHPA by not properly consulting with State Historic Preservation Officers or Tribal Historic Preservation Officers.  As indicated in the summary of the OIG's findings, the OIG reviewed six undertakings between 2015 and 2021 that Archeologist 1 and 2 were party to and determined that NPS was not the lead agency for any of these undertakings and thus was not required to enter into consultations under NHPA.  The OIG further determined that the lead agencies for these undertakings did comply with NHPA, entering into consultations with the appropriate officials in accordance with the NHPA.  I concur with the OIG's findings and therefore, the Department will take no further action.

### III.    Findings Regarding Archeologist 1 and 2 in Connection with the Partner Organization

My office has reviewed the OIG's extensive investigation with regard to Archeologist 1 and 2's interactions with the Partner Organization and concurs with all the OIG's. First, I agree that neither Archeologist 1 nor 2 sought ethics advice to ensure that they were in compliance with all applicable ethics requirements in contravention of NPS Director's Order 21. Second, I agree based on the OIG report, that Archeologist 2 violated both NPS Director's Order 21 and 5 C.F.R. § 2635.808 when he supported a fundraising campaign by the Partner Organization and identified himself as an NPS team lead. Archeologist 2 also violated 18 U.S.C. § 209 when he accepted payment for official travel from the Partner Organization without receiving the proper approval. Third, I agree with the OIG's determination that Archeologist 2 violated various government ethics regulations by assisting the Partner Organization with applications for both Federal and State grants. Finally, I agree that both Archeologist 1 and 2 violated 44 U.S.C. § 501 when they published official NPS work through an entity other than the U.S. Government Printing Office.

Archeologist 1 retired and is no longer in federal service while the OIG investigation was ongoing. As such, the Department is not taking any action in response to the OIG's finding that Archeologist 1 failed to comply with NPS Director's Order 21 when he did not seek ethics guidance prior to serving as a liaison for the Partner Organization.

With regards to Archeologist 2, the Department concurs with the OIG's findings as articulated above. The NPS, in conjunction with the Office of the Solicitor, Employment and Labor Law Unit, is currently evaluating this matter and intends to propose disciplinary action as appropriate. The Department commits to providing OSC with updates as this process proceeds.

### IV.    Finding Regarding Archeologist 2 Use of Government-Issued Equipment

My office has reviewed the OIG's investigation with regard to Archeologist 2's use of Government-issued equipment for personal use and his use of his title for personal gain. The Department concurs with the OIG that Archaeologist 2's use of his Government-issued equipment to conduct work for his personal business is in contravention of 5 C.F.R. § 2635.704.

As such, the National Park Service in conjunction with the Office of the Solicitor, Employment and Labor Law Unit, is currently evaluating this matter and intends to propose disciplinary action as appropriate. The Department commits to providing OSC with updates as this process proceeds.

### V.    Finding Regarding Archeologist 2's Affiliation with a Nonprofit Group

My office has reviewed the OIG's investigation regarding Archeologist 2's interaction with a separate Nonprofit Group and concurs with the OIG's findings that Archaeologist 2's actions violated 5 C.F.R. § 2635.704. Specifically, the use of a Government charge card to pay for expenses for the Nonprofit Group on two occasions by Archeologist 2, as outlined above, violated 5 C.F.R. § 2635.704.

The National Park Service, in conjunction with the Office of the Solicitor, Employment and Labor Law Unit, is currently evaluating this matter and intends to propose disciplinary action as appropriate. The Department commits to providing OSC with updates as this process proceeds.

## CONCLUSION

For all the reasons stated above, we concur with the extensive investigation and report of the Office of the Inspector General and have determined that some of the allegations referred as part of DI-21-000866 are substantiated.  Where appropriate, the Department is in the process of taking corrective action and will keep the OSC updated as to the progress of that corrective action.

If you have any questions or concerns, please contact Jeffrey Scott, Attorney-Advisor, Office of the Solicitor at (202) 513-0512 or Jeffrey.Scott@sol.doi.gov

Sincerely,

DONDRAE MAIDEN
Digitally signed by DONDRAE MAIDEN
Date: 2023.09.06 17:04:58 -04'00'

Dondrae N. Maiden
Acting Associate Solicitor for General Law
U.S. Department of the Interior



# Alleged Violations of the Native American Graves Protection and Repatriation Act

# I.     EXECUTIVE SUMMARY

We investigated allegations that two Archaeologists at a National Park Service (NPS) Research Center violated the Archaeological Resources Protection Act (ARPA) and the Native American Graves Protection and Repatriation Act (NAGPRA).[1] The allegations stated that Archaeologists 1 and 2 purchased Native American funerary items and transported Native American human remains from an alleged looter; violated ethics regulations in their association with an NPS partner organization (Partner Organization); and failed to perform project consultation with Native American Tribes under the National Historic Preservation Act (NHPA). We also investigated allegations that Archaeologist 2 used NPS resources to promote a personal business and violated ethics regulations through involvement with a nonprofit organization that Archaeologist 2 incorporated (Nonprofit Group).

We did not substantiate the allegations that Archaeologists 1 and 2 violated ARPA, NAGPRA, or the NHPA. However, we found that both Archaeologists 1 and 2 served as liaisons to the Partner Organization without the recommended ethics consultation. Archaeologists 1 and 2 violated Federal regulations by their actions that led the Partner Organization to publish information about their work at the NPS.

We also found that Archaeologist 2 violated Federal law, Federal regulations, and NPS policy by fundraising for the Partner Organization, accepting a debit card issued to Archaeologist 2 for the Partner Organization's bank account, using the Partner Organization debit card to pay for travel expenses for an archaeological project and to attend a conference in an official NPS capacity, and helping write and submit grant applications on behalf of the Partner Organization.

Further, Archaeologist 2 violated Federal law and regulations by using Government resources and equipment for a personal business, and a Government-issued purchase card to pay the Nonprofit Group. Archaeologist 2 also improperly used a Government-issued purchase card to pay a graphic designer to create the Nonprofit Group's website and Facebook page.

The U.S. Attorney's Office declined this case for prosecution. We are providing this report to the Secretary of the Interior for any action deemed appropriate.

# II.     BACKGROUND

The NPS Research Center conducts and shares anthropological research and provides archaeological and collections management assistance to national parks and partners. At the time of the events at issue here, both Archaeologists 1 and 2 worked for the NPS Research Center.

Archaeologist 1 worked as an archaeologist for the NPS Research Center. Archaeologist 1 assisted other agencies in preserving their archaeology resources, and supervised employees, including Archaeologist 2. Archaeologist 1 left the NPS in 2021, during the course of this investigation. Archaeologist 2 supervises other archaeologists and assists other agencies on archaeological projects.

The Partner Organization is a nonprofit organization that provides funding to the NPS Research Center

---

[1] 25 U.S.C. § 3001–3013.

for archaeological projects.[2] Separately, Archaeologist 2 incorporated the Nonprofit Group—an organization supporting local archaeological work.

## III.    RESULTS OF INVESTIGATION

### A. Under the Specific Facts at Issue in this Matter, We Found No Evidence That Archaeologists 1 and 2 Violated the ARPA, NAGPRA, or Related Statutes

*1.  Archaeologists 1 and 2 Received Native American Funerary Items From an Archaeological Collector*

In late 2017, an Archaeological Collector, approached Archaeologist 1 with an offer to sell the NPS Native American potsherds[3] retrieved from burial mounds on an Air Force Base, in the 1960s. Archaeologist 1 recalled telling the Archaeological Collector the NPS could not purchase the items from the Archaeological Collector's private collection because, if the Archaeological Collector had obtained the artifacts from the base, the artifacts would be considered funerary objects[4] and purchasing them would violate Federal law, namely, 18 U.S.C. § 1170, "Illegal trafficking in Native American human remains and cultural items." We found, however, that Archaeologist 1 asked a friend,[5] who was not a Federal employee, to purchase the potsherds from the Archaeological Collector so they could be donated to the State for preservation. In 2018, the friend gave Archaeologist 1 a personal check in the amount of $1,000 made payable to the Archaeological Collector. The friend never possessed the artifacts, despite paying for them, and did not intend to own them.

Later in 2018, Archaeologists 1 and 2 retrieved the potsherds from the Archaeological Collector's residence, at which time the Archaeological Collector also gave them two Native American skulls (as identified by the Archaeological Collector). Archaeologist 1 gave the two skulls and the potsherds to a State Employee. Archaeologist 1 said that the State Employee then loaned the potsherds to the NPS Research Center for study. The State Employee confirmed that Archaeologist 1 gave two purportedly Native American skulls to the State in April 2018, and said the State still possessed the skulls but was in the process of repatriating them. The State Employee had no recollection of Archaeologist 1 providing the State with potsherds and told us the State did not accept artifacts that were not collected on State land.[6] During our investigation, we located the potsherds stored on a bookshelf outside of Archaeologist 1's office at the NPS Research Center. We were unable to further question Archaeologist 1 about the potsherds because Archaeologist 1 invoked the right to counsel before a second interview.

The Archaeological Collector died in late 2018. According to the Archaeological Collector's widow, the Archaeological Collector had a permit from the Air Force Base to excavate archaeological items in the 1960s, but the widow no longer had a copy of the permit. We contacted an official at the Air Force Base, who could not locate any permit but stated the base had lost a significant number of paper records during a natural disaster. Accordingly, we could not verify whether the Archaeological

---

[2] As described subsequently, both Archaeologists were directly involved in the formation of the NPS Partner, and we identified violations of law and regulation in connection with that activity. We do not in this report, however, assess the propriety of continued relationships between the NPS and the Partner Organization.

[3] A "potsherd" is a pottery fragment and is typically found at an archaeological site.

[4] Funerary objects are objects that, as part of a death rite or ceremony, are reasonably believed to have been placed with individual human remains. 25 U.S.C. § 3001(3).

[5] The friend also served as board member for the Partner Organization.

[6] The State Employee told us that the skulls were of Native American ancestry. According to Archaeologist 1, the Archaeological Collector said the potsherds were obtained at the Air Force Base, which is Federal land.

Collector possessed the proper permit to excavate archaeological items on Federal land.

### 2.  No Evidence Established That the Archaeologists Violated ARPA, NAGPRA, or Related Statutes

U.S. Department of the Interior (DOI) regulations and ARPA[7] provide that no person or agency may excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public or Indian lands without a permit or exemption. An exemption generally relieves from the ARPA permit procedures Federal employees who carry out official agency duties involving management of archaeological resources on Federal land under the direction of a Federal land manager.[8]

To establish a criminal violation of ARPA, the Government must establish that an archeological resource that falls within the meaning of the statute was removed from public or Indian lands without a permit.[9] We identified no evidence disproving the widow's statement that the Archaeological Collector had a valid permit to excavate and remove the archeological resources from the base. We also note that although base officials could not find a permit, they acknowledged that the base had also lost records, meaning the permit records could have been destroyed at that time.

NAGPRA[10] prohibits intentional excavation and removal of Native American human remains and objects without first complying with certain consultation and other requirements.[11] The regulations implementing NAGPRA further clarify that the consultation requirement arises when notice is received that remains are or are likely to be Native American.[12] Upon receiving such notice, Federal agency officials must consult with known lineal descendants and with Native Americans and Native Hawaiian organizations that are likely to be culturally affiliated with human remains, funerary objects, sacred objects, and objects of cultural patrimony.[13]

We concluded that we could not establish that NAGPRA was applicable to the excavation or purchase of the potsherds because all evidence suggested that the Archaeological Collector obtained the items before NAGPRA's enactment in 1990. As a result, Archaeologists 1 and 2's acquisition of the potsherds did not violate NAGPRA, either.[14] We further determined that transporting the two Native American skulls did not constitute a criminal violation under 18 U.S.C. § 1170 because Archaeologists 1 and 2 did not transport them for sale or profit, which is a necessary element of that statute.

## B.  We Identified No Evidence That Archaeologists 1 and 2 Violated the NHPA

As NPS employees, the Archaeologists 1 and 2 worked on several projects that involved the NHPA,[15] which requires Federal agencies to determine whether a Federal undertaking (i.e., a project, activity, or

---

[7] 43 C.F.R. § 7.4(a); 16 U.S.C. § 470ee(a).

[8] 43 C.F.R. § 7.5(c). The exception provides, however, that the Federal land manager is still responsible for compliance with other procedures, such as Section 106 of the NHPA.

[9] 16 U.S.C. § 470ee.

[10] 25 U.S.C. § 3002(c).

[11] 25 U.S.C. § 3002(c).

[12] 43 C.F.R. § 10.5(a).

[13] Id. § 10.5(b).

[14] We also note that we identified no specific NPS or DOI policies or other guidance that would specifically prohibit Archaeologist 1 from using a third party to acquire the potsherds.

[15] 54 U.S.C. § 300101 et seq.; see also 36 C.F.R. § 800.1(a).

program funded in whole or in part by a Federal agency) could affect historic properties.[16] If the Federal agency determines that the undertaking could affect historic properties, the agency is required to consult with State Historic Preservation Officers (SHPOs) and Tribal Historic Preservation Officers (THPOs), among others, as appropriate. When more than one Federal agency is involved in an undertaking, one agency is designated as the lead agency and becomes responsible for ensuring the NHPA consultation process is followed.[17] The goal of consultation is to identify historic properties that would potentially be affected by the undertaking; assess its effects; and seek ways to avoid, minimize, or mitigate any adverse effects on historic properties.

We found that the lead agencies for the projects involving Federal undertakings performed the required consultations in compliance with the NHPA. In particular, six Federal undertakings included in the allegations that we investigated involved Archaeologists 1 and 2.

In short, we did not find that Archaeologists 1 and 2 violated the NHPA consultation requirement because, in all of the cited instances, the NPS was not the lead agency; consultation did, in fact, occur; or no consultation was required.

## C. Archaeologists 1 and 2 Did Not Follow a Recommendation to Seek Ethics Advice Before Serving as Liaisons to the Partner Organization

NPS Director's Order 21 set forth the NPS Director's delegation of authority for philanthropic partnerships—including donations, fundraising, and sponsorships—and established the roles and responsibilities for NPS employees who work with such philanthropic partners.[18] The order states that NPS employees cannot be voting members or serve on the board of directors for a philanthropic partner, but it is silent regarding whether it is permissible for an NPS employee to serve as the incorporator. The order allows NPS employees to serve as liaisons to authorized philanthropic partners as part of their official duties and states that liaisons "should" consult with an NPS ethics officer to ensure compliance with all applicable ethics requirements.[19]

NPS Supervisor 1 at the NPS Research Center told us that while serving as the NPS Research Center Director, NPS Supervisor 1 wanted to establish a philanthropic partner for the NPS Research Center and directed Archaeologist 1 to conduct research on the issue. With the stated intent to create a philanthropic partner for the NPS Research Center, Archaeologist 1 incorporated the Partner Organization with the State and paid the filing fee with personal funds. Afterwards, NPS Supervisor 1 signed the agreement establishing an official agreement between the NPS Research Center and the Partner Organization.[20]

Archaeologist 1 told us that the NPS Supervisor appointed Archaeologist 1 to be a liaison to the Partner Organization, per Archaeologist 1's request. Archaeologist 1, in turn, assigned a subordinate,

---

[16] 36 C.F.R. § 800.16(y). This regulation explains that a Federal undertaking is a project or activity funded, permitted, licensed, or approved by a Federal agency. Historic properties include artifacts, records, and remains that are related to and located within historic properties and any properties of traditional religious and cultural importance to Native American Tribes. *See also* 54 U.S.C. § 306108.

[17] 36 C.F.R § 800.2(a)(2).

[18] Director's Order 21: *Donations and Philanthropic Partnerships*, effective Dec. 28, 2016, as amended Aug. 31, 2020.

[19] *Id.* section 3.1.1, "Ethical Conduct Requirements for All Employees."

[20] We do not, in this report, assess the propriety of NPS Supervisor 1's actions in approving an agreement with a philanthropic entity that an employee had established.

Archaeologist 2, to be an additional liaison.[21] Neither Archaeologist 1 nor Archaeologist 2 consulted with an NPS ethics officer; both told us they did not know at the time they were appointed as liaisons that the policy addressed this issue. In a 2021 interview, Archaeologist 2 reported recently learning of the recommended ethics consultation for liaisons to philanthropic partners and that Archaeologist 2 was in the process of seeking that consultation with an ethics officer. We found that Archaeologist 2 first contacted the Ethics Office in 2021, before our interview.[22]

### D. Archaeologists 1 and 2 Violated Various Ethics Requirements In Connection With the Partner Organization

*1.  Archaeologist 2 Violated NPS Director's Order 21, Government Ethics Standards, and 18 U.S.C. § 209 by Creating a Fundraising Campaign and Accepting the Partner Organization's Payment of Travel Expenses*

NPS Director's Order 21 states that, "[a]s a matter of policy, the NPS does not permit employees to solicit donations."[23] Further, the *Standards of Ethical Conduct for Employees of the Executive Branch* prohibits an employee from requesting or otherwise encouraging donations to a nonprofit organization in his or her official capacity.[24]

We found that, in 2018, the Partner Organization raised money through a fundraising campaign and provided the funding to the NPS Research Center for the a project. Archaeologist 2, in an official capacity, was the NPS lead for the project. Archaeologist 2 initially denied actively fundraising for the project on behalf of the Partner Organization but later conceded to helping the Partner Organization establish the campaign. Archaeologist 2 acknowledged providing the link to the fundraising site in social media posts on a dedicated message board, where Archaeologist 2 had also posted about being the NPS team lead and commented that donations were being accepted at the posted link. We found that Archaeologist 2 uploaded these social media posts in 2018, from both a personal Facebook account and a message board.

Archaeologist 2's involvement with fundraising for the Partner Organization violated both 5 C.F.R. § 2635.808 and NPS Director's Order 21 because Archaeologist 2 publicly supported the Partner Organization's fundraising campaign and, in doing so, was specifically identified as the NPS team lead. Archaeologist 2 recounted believing that those actions were ethical under NPS Director's Order 21; however, the order specifically states that the NPS does not permit employees to solicit donations for philanthropic partners.[25]

In addition, Archaeologist 2 told us the Partner Organization used some of the money raised through the fundraising campaign to pay for travel expenses to perform archaeology work on a project.[26]

---

[21] NPS Supervisor 1 confirmed being aware that both Archaeologists served as liaisons to the Partner Organization as part of their official duties, which was allowed under NPS policy. We do not assess the propriety of NPS Supervisor 1's actions in permitting Archaeologist 1 to act as a liaison to the Partner Organization under the circumstances.

[22] It is our understanding that the Ethics Office expressed an intent to draft the liaison letter to enable Archaeologist 2 to serve in this capacity.

[23] Section 3.1.2, "General Prohibition on Solicitation by Employees."

[24] 5 C.F.R. § 2635.808, "Fundraising activities." Although the regulation identifies certain exceptions, none applied here. *Id.*

[25] *Id.* at section 3.1.2, "General Prohibition on Solicitation by Employees."

[26] We were unable to determine the total cost the Partner Organization paid for Archaeologist 2' travel expenses. We did, however, identify three travel vouchers for which Archaeologist 2 claimed meals and incidental expenses (M&IE) for each day of travel. The Federal Government paid these vouchers, which included M&IE from three trips in 2018 and 2019. Archaeologist 2 did not claim lodging expenses on the vouchers. One of Archaeologist 2's social media posts about the trip noted that a community organization that paid for and completed a project that Archaeologist 2 worked on, provided lodging for the trip.

Government employees, however, may not receive any type of contribution to or supplementation of their salary or other compensation for their official services. The payment of travel expenses may constitute just such a "supplementation."[27]

Although Federal agencies can accept travel payments on behalf of their employees with proper approval,[28] Archaeologist 2 acknowledged not seeking or obtaining approval to have official travel expenses paid for by outside entities, and we found no evidence to the contrary. Accordingly, Archaeologist 2 accepted the payments to travel and conduct official archaeology work in violation of 18 U.S.C. § 209.

*2.  Archaeologist 2 Improperly Used a Partner Organization Debit Card for Official NPS Travel Expenses in Violation of 18 U.S.C. § 209*

We also found that the Partner Organization issued Archaeologist 2 a debit card that allowed Archaeologist 2 to withdraw money from the Partner Organization's bank account. Archaeologist 2 initially denied having a debit card from the Partner Organization but later recalled receiving such a card sometime in 2016 or 2017, when the Partner Organization was created. Archaeologist 2 recalled using the Partner Organization debit card to pay for airline travel, hotel, and parking expenses in 2019 to attend a conference in an official capacity as an NPS employee. Archaeologist 2 recounted presenting a paper at the conference about official NPS work. Archaeologist 2 reported using the Partner Organization debit card to pay for all conference travel expenses. Archaeologist 2 said that Archaeologist 1 approved the trip to attend the conference, but we did not identify any approved travel authorization for Archaeologist 2 to attend this conference.

According to the Partner Organization's general ledger, the airfare, lodging, and parking expenses for Archaeologist 2's conference attendance totaled over $1,300. Archaeologist 2 reported believing NPS Director's Order 21 allowed the Partner Organization to pay for travel expenses. The policy, however, specifically states that it does not apply to donations of official travel expenses covered by 31 U.S.C. § 1353, which permits donations for attendance at a meeting or similar function only if there are certain approvals. As with Archaeologist 2's use of Partner Organization funds for travel for a project, Archaeologist 2 admitted to not obtaining ethics approval to have the Partner Organization pay for travel to the conference and did not in fact disclose to the NPS that an outside party paid for the travel expenses. This conduct also violated 18 U.S.C. § 209.

*3.  Publication of NPS Work Violated 44 U.S.C. § 501*

Federal law requires that "[a]ll printing, binding, and blank-book work for Congress, the Executive Office, the Judiciary, other than the Supreme Court of the United States, and every executive department, independent office and establishment of the Government, shall be done at the Government Publishing Office."[29]

During our investigation, we found NPS work available as a print-on-demand publication, which included official logos. The listed authors were Archaeologists 1 and 2, along with two other authors. The Partner Organization published the work, which detailed the official work the NPS. Archaeologists 1 and 2 both acknowledged that the work included official NPS reports the

---

[27] 18 U.S.C. § 209, "Salary of Government officials and employees payable only by United States."; *see also U.S. v. Martel*, 792 F.2d 630 (7th Cir. 1986) (acknowledging that external payment or reimbursement of a Federal employee's work-related travel expenses may violate this statute); *U.S. v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979) (same).

[28] 31 U.S.C. § 1353, "Acceptance of travel and related expenses from non-Federal sources."

[29] 44 U.S.C. § 501.

Archaeologists wrote with the other authors[30] for the work they all performed for a project. Archaeologists 1 and 2 both said they believed the reports were public domain information.

NPS Supervisor 1 reported not being aware of any Government regulations that would prohibit them from doing so.

Archaeologist 1 reported understanding that they did not have permission to use official logos. Archaeologist 2, however, said NPS Supervisor 1 had given permission to use the NPS logo and that a DOI Manager had given permission to use another logo. NPS Supervisor 1 told us he gave Archaeologists 1 and 2 permission to publish the work, but stated that they did not ask for permission to use the official NPS logo. The DOI Manager confirmed authorizing using the other logo but was under the impression that the work would be published through the U.S. Government Publishing Office (GPO) and did not know it would be sold elsewhere.

Archaeologists 1 and 2 both said that, at the request of an NPS Employee, they removed the work from the online retailer because it contained the official NPS logo.[31]

The publication of this work violated Federal law requiring all Federal printing work to be performed by the GPO.[32] Although executive department agencies may obtain a waiver for these requirements,[33] we found no evidence that any such waiver was issued in this matter.

4. *Archaeologist 2's Work on Grant Applications for the Partner Organization Violated Government Ethics Regulations*

Various Federal regulations prohibit conduct that creates or appears to create a conflict of interest. In particular, Federal employees "shall not hold financial interests that conflict with the conscientious performance of duty."[34] Employees are also required to "act impartially and not give preferential treatment to any private organization or individual,"[35] and they may not "use or permit the use of their Government position or title, or any authority associated with their public office to endorse any product, service or enterprise."[36] In addition, "[e]mployees shall endeavor to avoid any actions creating the appearance that they are violating the law, or the ethical standards set forth in part."[37] Through work on grant applications for Partner Organization, Archaeologist 2 violated these provisions. The Partner Organization applied for several State-funded grants to assist the NPS Research Center with archaeological projects. The Partner Organization also applied for federally funded grants through the State, but the NPS Research Center was prohibited by the terms of the partnership agreement itself from working on any projects with the Partner Organization that were funded with Federal dollars. Archaeologists 1 and 2 both acknowledged that they had assisted the Partner Organization with its grant proposals. In particular, in 2020, the Partner Organization applied for a State-funded grant to erect signs at various historical sites. Archaeologist 2 recounted assisting the Partner Organization with

---

[30] We do not in this report assess the conduct of the other authors.

[31] Before Archaeologists 1 and 2 removed the work, the Partner Organization received less than $20 in royalties from the online retailer in 2018 from the work's sales. Archaeologists 1 and 2 and the other authors all told us they never received any royalties. We found no evidence to contradict their statements.

[32] 44 U.S.C. § 501.

[33] *Id.* § 504.

[34] 5 C.F.R. § 2635.101(b)(2).

[35] 5 C.F.R. § 2635.101(b)(8).

[36] 5 C.F.R. § 2635.702(c).

[37] 5 C.F.R. § 2635.101(b)(14).

this application, including writing the statement of work. Archaeologist 2 recalled not knowing the Partner Organization had listed Archaeologist 2 as a point of contact (POC) on the grant application.[38] Archaeologist 2 did not remember submitting the grant application to the State and thought a Partner Organization board member did so.

Archaeologist 2 recalled NPS Supervisor 2 (Archaeologist 2's supervisor) pointing out that Archaeologist 2 was listed as a POC for the Partner Organization on the grant application and as an Partner Organization POC in the System for Award Management (SAM).[39] Archaeologist 2 contacted the Partner Organization and asked it to remove Archaeologist 2's name from the grant application and SAM. A Partner Organization Official reported learning Archaeologist 2 was listed as the Partner Organization POC in SAM in 2021, and that Archaeologist 2 expressed surprise when contacted by the Official. The Official recounted volunteering to be listed instead.[40]

Separately, at some point before the summer of 2020, Archaeologist 2 helped the Partner Organization prepare the statements of work for two grants the Partner Organization submitted to the State. Archaeologist 2 acknowledged submitting grant applications on behalf of the Partner Organization but could not recall which specific grant applications Archaeologist 2 submitted.

Archaeologist 2 also reported sending an undated letter in an official capacity on NPS letterhead to the State's Historic Preservation Grants Program recommending it consider providing grant funding to the Partner Organization for a project. The letter did not mention that the Partner Organization is a philanthropic partner to the NPS Research Center or that Archaeologist 2 was an official liaison to the Partner Organization. Archaeologist 2 reported sending the letter because the project was in a national park and because Archaeologist 1 needed to demonstrate the NPS' support for the project. Archaeologist 2 reported not believing there was a problem with sending this letter, but Archaeologist 2 also did not know of any NPS policy that required the NPS to send this type of letter.

In summer 2020, an NPS Employee informed Archaeologists 1 and 2 that they could no longer be involved in the grant application process for the Partner Organization. In written notes from a 2020 discussion the NPS Employee had with Archaeologists 1 and 2, the NPS Employee explained that the governing partnership agreement states the Partner Organization is responsible for all grant-writing activities. The NPS Employee reiterated this position to them in an email later in 2020.

As described previously, the Partner Organization provided Archaeologist 2 a debit card that provided access to grant funds the organization received. This fact, even aside from the other aspects of Archaeologist 2's conduct, presented a financial conflict of interest for Archaeologist 2's actions in helping to prepare and submit grant applications on behalf of the Partner Organization violated regulations prohibiting Archaeologist 2 from holding a financial interest that could "conflict with the conscientious performance" of Archaeologist 2's duty.[41] At the very least, Archaeologist 2's dual role improperly created the appearance of a potential personal financial interest in Partner Organization's receipt of grants.[42]

---

[38] The "Review and Submit" portion of the application included Archaeologist 2's name in the field for "grant submitter."

[39] NPS Supervisor 2 became Archaeologist 2's supervisor in 2021. SAM is a Governmentwide portal that consolidates the capabilities of multiple systems and information sources used by the Federal Government in conducting the acquisition and financial assistance processes, including grants.

[40] Archaeologist 1 separately recounted learning, at some point, the Partner Organization had listed Archaeologists 1 and 2 as POCs for the Partner Organization in SAM. Archaeologist 1 recalled asking the Partner Organization to remove their names.

[41] 5 C.F.R. § 2635.101(b)(2).

[42] 5 C.F.R. § 2635.101(b)(14).

In addition, Archaeologist 2 sent correspondence on NPS letterhead in an official capacity requesting the State to consider the Partner Organization for a grant. This was an improper use of Archaeologist 2's Government position to endorse an enterprise,[43] and moreover violated Archaeologist 2's obligation to act impartially and avoid giving preferential treatment to a private organization.[44]

### E.  Archaeologist 2 Violated Various Federal Regulations by Using Government Equipment and Government Position for Personal Business

In addition to the provisions requiring impartiality and that prohibit the use of a Government title or position for personal gain, various regulations prohibit the use of Government equipment for personal business. For example, the regulations state "[a]n employee has a duty to protect and conserve Government property and shall not use such property, or allow its use, for other than authorized purposes."[45] The *Departmental Manual* specifically provides for only limited personal use of Government equipment, and it does not permit use of Government resources for personal business activities.[46] In addition, Government employees may not "use or permit the use of their Government position or title, or any authority associated with their public office in a manner that could reasonably be construed to imply that their agency or the Government sanctions or endorses their personal activities."[47] Archaeologist 2 violated numerous provisions through the use of Government resources and Archaeologist 2's Government title in connection with personal business activities.

In 2014, Archaeologist 2 established a personal business with the State. Archaeologist 2 created and operated the personal business with two other individuals who are not Government employees.[48]

We identified multiple files on Archaeologist 2's Government-issued laptop related to the personal business. Some of these documents included a blank contract template for the personal business, copies of various editions of the business journal, and a 2020 contract signed by Archaeologist 2. We also searched the NPS Research Center's server and found more than 400 Microsoft Word, Microsoft Excel, and Adobe PDF files related to the personal business. Some of these documents included contracts for the business signed by Archaeologist 2 and copies of the business journal.

Archaeologist 2 admitted to not obtaining NPS permission to use a Government-issued laptop or the programs installed on the laptop for a private business, and to not obtaining permission to save personal business files on either Archaeologist 2's Government-issued laptop or on the NPS Research Center's servers. Archaeologist 2 said that, when using as Government-issued laptop to edit stories for the personal business, Archaeologist 2 did so on the weekends and not on official Government time. Archaeologist 2 also reported using the Adobe Photoshop program on the Government-issued laptop for personal business. Archaeologist 2 opined the personal business files stored on the NPS Research Center's servers must have been automatically backed up from the Government-issued laptop.

Archaeologist 2's use of a Government-issued laptop to conduct personal business, as well as storing personal business documents on the Government laptop's hard drive and the NPS Research Center's

---

[43] 5 C.F.R. § 2635.702(c).

[44] 5 C.F.R. § 2635.101(b)(8).

[45] 5 C.F.R. § 2635.704, "Use of Government property."

[46] 410 *Departmental Manual* 2.

[47] 5 C.F.R. § 2635.702(b).

[48] The company is currently inactive and was administratively dissolved in 2018 for failing to file an annual report with the State.

servers violated restrictions on using Government resources for personal, for-profit activities.[49] There are no exceptions that would have applied in these circumstances.

Separately, a screen capture of the webpage for a publication Archaeologist 2 edited through the personal business, noted in the "About the Author" section that Archaeologist 2 worked for the NPS. Because of its prominence and centrality to the description, this was inconsistent with provisions that prohibit Federal employees from using their Government position or title in a way that could be construed as implying that the Government endorses their personal activities.[50]

## F. Archaeologist 2 Violated Federal Regulations Through an Affiliation With the Nonprofit Group

Federal regulations prohibit the use of public office for private gain.[51] Archaeologist 2 violated these provisions by improperly using a Government charge card to pay for invoices issued by an organization Archaeologist 2 created. Archaeologist 2 also violated these provisions by using a Government charge card to pay for an outside business to create a website and Facebook page for the Nonprofit Group.

In 2020, Archaeologist 2 incorporated the Nonprofit Group, aimed at supporting local archaeological work, with the State.[52]

Archaeologist 2 recalled coming up with the idea for the Nonprofit Group with a DOI Employee after they had discussed how to notify the public that NPS Historic Preservation Fund grants through the State would be available for eligible recipients affected by a natural disaster.[53] The DOI Employee was a liaison to the Federal Emergency Management Agency (FEMA), and informed Archaeologist 2 that FEMA would be providing funding to the NPS for cultural resource protection and preservation in the aftermath of the natural disaster. The DOI Employee recounted stating that the DOI office provided funds from FEMA to the NPS Research Center for outreach about the grant funds that would be available through the State for qualified recipients.

Archaeologist 2 acknowledged incorporating the Nonprofit Group after learning about the funding the NPS Research Center would receive from FEMA. Archaeologist 2 said the purpose of the Nonprofit Group was to educate rural, poor communities on how to apply for these grants. Archaeologist 2 reported opening the bank account for the Nonprofit Group with a Partner Organization board member and was an authorized signer on the Nonprofit Group's account. Archaeologist 2 also acknowledged, and we confirmed, electronically signing for the Nonprofit Group's bank account at the bank with a Government PIV card. Archaeologist 2 recalled signing the bank document on official Government time because Archaeologist 2 believed it was part of the official job duties. Archaeologist 2 acknowledged, however, not disclosing to anyone within the NPS that Archaeologist 2 had established the bank account for the Nonprofit Group.

Archaeologist 2 also acknowledged, and we confirmed, creating an account for the Nonprofit Group in 2020. Archaeologist 2 recalled creating a Nonprofit Group invoice for $10,000 to conduct webinars

---

[49] 5 C.F.R. § 2635.704; 5 C.F.R. § 2635.101(b)(14); 410 *Departmental Manual* 2.

[50] 5 C.F.R. § 2635.702(b).

[51] 5 C.F.R. § 2635.702.

[52] The Nonprofit Group is currently inactive and was administratively dissolved in 2021 for failing to file annual reports with the State.

[53] The DOI Employee acknowledged sharing the idea to create the Nonprofit Group with Archaeologist 2 but denied telling Archaeologist 2 to incorporate the Nonprofit Group. We found no evidence to the contrary.

and sent it to Archaeologist 2's NPS email address for payment. Archaeologist 2 then paid the Nonprofit Group $10,000 with a Government-issued purchase card in 2020. Archaeologist 1, as Archaeologist 2's supervisor at the time, was responsible for reviewing Archaeologist 2's purchase card statements. We could not interview Archaeologist 1 about this transaction because Archaeologist 1 had invoked the right to counsel. NPS Supervisor 2, who at the time of this transaction was Archaeologist 1's supervisor, had started reviewing Archaeologist 2's purchase card statements in 2020. NPS Supervisor 2 recounted matching dollar amounts on the statements with supporting documentation and noted this particular transaction appeared to be in accordance with NPS policy. NPS Supervisor 2 said Archaeologist 1 had not told NPS Supervisor 2 about creating the Nonprofit Group.

Archaeologist 2 reported attempting to transfer the $10,000 from the Nonprofit Group's payment account to its bank account but was unable to do so. Archaeologist 2 then transferred the funds to a personal payment account and then to a personal bank account. Archaeologist 2 ultimately withdrew the funds from the personal bank account and deposited them into the Nonprofit Group's bank account.

The Nonprofit Group used the $10,000 to hire a company to provide organizational management and consulting services. Archaeologist 2 reported recommending the company to the Nonprofit Group's Board of Directors and that a relative worked for the company. We confirmed that the company provided the services for which it was paid.

We found that using a Government charge card to pay for expenses for the Nonprofit Group violated 5 C.F.R. § 2635.702, "Use of public office for private gain," which, as described previously, prohibits use of an official position for his own benefit or those of others. Here, Archaeologist 2 used a Government purchase card to pay an entity that Archaeologist 2 created, which then paid the company at which a relative worked. Archaeologist 2 moreover recommended that the Board of Directors retain this company.

We also found that, in 2020, Archaeologist 2 hired a graphics company to create a website and Facebook page for the Nonprofit Group. Archaeologist 2 paid the owner of the graphics company $2,500 with a Government-issued purchase card for the work in 2020. The owner of the graphics company reported believing the company was being hired by the Nonprofit Group and not by the NPS.

The NPS received no benefit from paying for the creation of a Nonprofit Group website and Facebook page. Consequently, Archaeologist 2 misused a Government-issued purchase card by paying $2,500 to the graphics company and by doing so acted contrary to 5 C.F.R. § 2635.702.

## IV.    SUBJECTS

Archaeologist 1, Former Archaeologist, NPS Research Center, NPS.

Archaeologist 2, Archaeologist, NPS Research Center, NPS.

## V.    DISPOSITION

We referred our investigative findings to the U.S. Attorney's Office and it declined the case for prosecution.

We are issuing this report to the Secretary of the Interior for any action deemed appropriate.

11

Exhibit B

PRESS RELEASE

## Park Service Archeological Scandal Sparks No Reforms

*Apr 15, 2024*  |  Tags: **Florida**, **NAGPRA**, **NPS**

**FOR IMMEDIATE RELEASE**
Monday, April 15, 2024
**CONTACT**
Jeff Ruch **jruch@peer.org** (510) 213-7028

---

# Park Service Archeological Scandal Sparks No Reforms

## Trade in Native American Skulls and Funerary Pots Did Not Trigger Charges

*Washington, DC* — A multi-year investigation has concluded that two National Park Service (NPS) archeologists committed extensive financial and ethical improprieties, but their trafficking in stolen Native American human remains did not constitute violations of law. That result creates

a bad precedent which may hinder the legally required repatriation of such materials in the future, according to Public Employees for Environmental Responsibility (PEER).

A whistleblower allegation filed through the U.S. Office of Special Counsel in 2021 ultimately led to an investigation conducted by the Interior Department's Office of Inspector General (IG). The targets of that probe were two NPS archeologists, Jeff Shanks and Mike Russo, who worked at the agency's Southeast Archeological Center (SEAC). While working for NPS, the two were also setting up a private archeology business while misusing NPS resources, including letterhead.

The IG referred these violations to the U.S. Attorney, who declined prosecution. NPS initially ignored internal complaints about the archeologists' conduct and initiated proposed disciplinary action against Shanks and Russo only after the IG report, but the pair resigned before that came to fruition.

The IG also substantiated that in 2017, Shanks and Russo befriended a known looter of burial mounds who offered to sell his collection of funerary pots and two Native American skulls. The two archeologists retained a straw buyer to "purchase" the materials, which were then stored at the SEAC facility. For five years, the funerary pots were kept in cardboard boxes while students and staff handled, photographed, and researched the skulls and pots. All the while, they did not inform any federally recognized tribe that they possessed the collection, as required by the Native American Graves Protection and Repatriation Act (NAGPRA).

The IG agents found 21 funerary pots still sitting on shelves within the SEAC facility, yet –

- To date, no tribe has been informed, let alone consulted, about these events;

- Rather than contact any tribe, the skulls were given to the State of Florida Bureau of Archeological Collections for storage, where they remain today; and

- NPS did not change SEAC management or issue any procedural changes to prevent recurrence despite adopting rules to strengthen NAGPRA implementation in 2023.

"By ignoring these blatant desecrations and focusing only on ethics violations, the IG made a bad situation worse," stated Pacific PEER Director Jeff Ruch, noting that the IG wrongly concluded the archeologists did not technically violate NAGPRA because it could not prove the notorious looter lacked a "permit" of which there was no record. "The whole point of NAGPRA is to protect Native American burial mounds and graves from systematic desecration in the name of 'archeological science.'"

The absence of consequences for the two archeologists in this case until a whistleblower stepped forward and put their career on the line follows a pattern of lenient treatment for higher-ups within NPS, a perception reflected in dismally low morale scores in the annual Federal Employee Viewpoint Survey. This perception is also compounded by recent promotions of senior managers within NPS who had engaged in serious misconduct.

"As an institution, the Park Service has a deep history of being accountability proof," added Ruch, pointing to the NPS whitewashing of years of tremendous cultural resource damage at Effigy Mounds National Monument by agency officials. "Without the whistleblower stepping up, the outrageous misconduct in this case would almost certainly still be going on."

### 

*Read the Special Counsel referral letter*

*View the Interior IG report*

*Compare the whistleblower's comments*

*Scan Special Counsel's letter to President Biden*

*Examine 2023 NPS rules to strengthen NAGPRA implementation*

*Look at abysmal NPS employee morale survey ratings*

*See NPS history of promoting bad actors*

*Revisit the Effigy Mounds scandal*

SHARE

✉ SUBSCRIBE

---

**RECENT PRESS RELEASES**

PEER Sues EPA After Agency Fails to Produce Evidence to Back up Zeldin's Defamatory Remarks Against EPA Staff

Government Lawyer and Investigator Aaron Lloyd Joins PEER as Senior Counsel

Under EPA's Zeldin, Pollution Enforcement Dying a Quick Death

PEER Demands Accounting from Interior Department Over "Freedom250" Use of Taxpayer Funds

Federal Employee First Amendment Lawsuit Advances

PEER Opens Investigation Seeking Records Behind Interior Department's Offshore Wind Halt

At Least $10 Billion Was Spent on Paying Federal Staff to Do Nothing in 2025

---

**RECENT BLOG POSTS**

COMMENTARY | Testimony on Freedom 250 and the Lack of Transparency in America's Semiquincentennial

COMMENTARY | Evisceration of the Federal Communications Commission NEPA

COMMENTARY | Trump and Congress Just Gifted Big Oil a Multimillion Dollar Stocking Stuffer

COMMENTARY | Building Accountability Back Into Government: Why It's Essential for the Environment and Public Health

COMMENTARY | Environmental Attacks Continue at Full Speed; Much of it Under the Radar

COMMENTARY | Confronting the Rise of Authoritarianism

COMMENTARY | East Wing Demolition Metaphor for Trump Governance

## CONNECT: 

SUBSCRIBE TO PEERMAIL »

**Phone: 202-265-7337**
962 Wayne Avenue, Suite 610
Silver Spring, MD 20910-4453

**Privacy Guarantee • Contact PEER • Donate**
Copyright 2001–2026 Public Employees for
Environmental Responsibility
**PEER is a 501(c)(3) organization**
**EIN: 93-1102740**